RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0132p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

DONNETTA SMITH, CHARLES SMITH, and
LOGAN SMITH,

              *Plaintiffs-Appellees*,

      v.

MARK STONEBURNER and DAMON KNAPP, in
their individual capacities,

              *Defendants-Appellants*.

No. 12-1963

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:11-cv-00390—Gordon J. Quist, District Judge.

Argued: April 24, 2013

Decided and Filed: May 10, 2013

Before: DAUGHTREY, SUTTON and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Michael S. Bogren, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellants. William F. Piper, WILLIAM F. PIPER, PLC, Portage, Michigan, for Appellees. **ON BRIEF:** Michael S. Bogren, Mary Massaron Ross, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellants. William F. Piper, WILLIAM F. PIPER, PLC, Portage, Michigan, for Appellees.

_____

## OPINION

_____

SUTTON, Circuit Judge. But for the want of $14.99 or a warrant, this case would not exist. After Charles Smith shoplifted a phone charger, two police officers went to his house. In the course of arresting him, they entered his house twice (without a warrant each time), forcefully restrained him and injured his mother. In response,

Smith and his mother filed this action claiming that the officers violated their Fourth and Fourteenth Amendment rights and some state law duties to boot. Accepting the plaintiffs' fact-supported allegations as true, as we must at this stage of the litigation, we affirm the district court's denial of qualified immunity to the two officers.

I.

For $14.99, one can buy a cell phone charger with a car adapter at the Walgreens in Sturgis, Michigan. That price apparently was too steep for Smith, age 20, who stopped by the store on May 25, 2010. Store employees saw Charles take a charger off the shelf, place it in his cart, walk around the store, hide the charger on a different shelf behind packages of straws and then start to leave. The store manager intercepted Charles on his way out, and Charles showed him where he hid the charger. The package had been opened, and the part of the charger that connects into the phone had been cut off and removed. The manager asked Charles to stay at the store while he called the police, but Charles refused and walked home, a home as it turns out within sight of the Walgreens.

Officers Mark Stoneburner and Damon Knapp of the Sturgis Police Department responded to the call. They interviewed the store's employees, reviewed a security videotape and decided to talk to Charles.

When the two officers pulled up in front of the Smith house, they found Charles' 19-year-old brother, Logan, outside. Stoneburner asked Logan if Charles was home, and Logan said he was upstairs. When Stoneburner asked whether the officers could enter the house, Logan told Stoneburner that he would ask his mother and that they could wait on the back deck of the house while he checked. Stoneburner and Knapp followed Logan to the back. As Logan went into the house, Stoneburner started to follow him through the door. Logan said nothing but "gave him a look like why are you coming in the house, I told you to wait on the deck." Logan Smith Dep., R. 44 at 11. Stoneburner entered the home anyway, while Knapp stayed outside. Logan retrieved Charles from his bedroom upstairs and brought his mother, Donnetta, down too. Stoneburner asked Charles to step outside on the deck, and all three Smiths complied.

Once outside, Stoneburner asked Charles about the incident at Walgreens. Charles denied stealing or cutting the phone charger and allowed Stoneburner to pat him down. Stoneburner found only a lighter. Undeterred, Stoneburner asked Charles if he could look inside the house. Charles mumbled something and started walking back inside. Stoneburner followed, asking Charles whether the police should know about anything he had inside. Charles opened the door, re-entered the house and started to pull the door closed behind him. Stoneburner held the door open, told Charles to stop and crossed the threshold of the doorway to grab Charles by the wrist. He pulled Charles back outside. At the same time, Donnetta told Stoneburner not to touch her son and moved between Stoneburner and Charles. Stoneburner collided with Donnetta, causing her to hit the side of the house.

After pulling Charles outside, Stoneburner bent him over the railing, and Knapp told him he was under arrest. Charles stiffened his body, making it more difficult for the officers to place his hands behind his back. Stoneburner and Knapp each grabbed one of Charles' arms, bent him over the railing and pressed his head against the wall as they handcuffed him. The officers charged Charles with third-degree retail fraud, a misdemeanor, after which Charles pled guilty to a lesser misdemeanor: disturbing the peace.

The Smiths filed this lawsuit under § 1983 and state law, alleging that Stoneburner unconstitutionally entered their home two times and that the officers used excessive force against Charles and Donnetta. The district court denied qualified immunity to the officers on all of the claims and granted summary judgment in favor of Charles on one of them: Stoneburner's second entry into the house when he grabbed Charles and pulled him back outside.

## II.

In this qualified immunity case, as in all qualified immunity cases, two questions arise: whether the officers violated the Smiths' constitutional rights, and if so whether those rights were clearly established at the time. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In considering the officers' claim that they should prevail as a matter of law

on one or both of these questions, we draw all reasonable factual inferences in favor of the plaintiffs.  *See Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012).

A.

First up is whether Officer Stoneburner violated the Smiths' Fourth Amendment rights when he followed Logan into the house to look for Charles.  Police officers, it has long been true, may not enter a private home without a warrant absent an exigency or consent.  *Payton v. New York*, 445 U.S. 573, 590 (1980).  Stoneburner does not claim that he had a warrant when he entered the home, and he does not claim any exigency justified the entry.  He instead leans on the consent exception.

Police officers do not need a warrant when residents invite them into their homes.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  "[M]ere acquiescence," however, does not show consent; the resident must freely invite the officer into the house.  *United States v. Moon*, 513 F.3d 527, 538 (6th Cir. 2008).

Did Logan invite Stoneburner into the house?  Maybe yes; maybe no.  According to Stoneburner and Knapp, Logan said something they could not understand, held the door open and never told them they could not enter.  According to Logan, he told the officers they needed to "wait on the porch while I go inside," and he gave Stoneburner a look "like why are you coming in the house" when the officer nonetheless followed him.  Logan Smith Dep. at 11.  That is the epitome of a triable issue of fact, *see Schneckloth*, 412 U.S at 227, one over which our authority recedes and the jury's takes over.

Stoneburner insists that, in a close call, officers should win because qualified immunity protects all but "the plainly incompetent."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  That may be true.  But that is not the problem Stoneburner faces.  The testimony shows two competing versions of what happened, only one of which can be true.  If a jury credits Logan Smith's version of the events, that would mean Stoneburner ignored Logan's request to stay outside.  That would not be a close call when it comes to consent, and that finding would not shield Officer Stoneburner from liability.

*Gerald M. v. Conneely*, 858 F.2d 378 (7th Cir. 1988), changes nothing.  The Seventh Circuit held that a homeowner consented to a police officer's entrance when she told the officer to "wait here" at the front door and she "did nothing to indicate to him that she disapproved" when she noticed that he was waiting inside the front door.  *Id*. at 384.  Neither factual premise of that ruling appears here.  Logan did not say "wait here," which might mean waiting inside the front door or waiting outside of it.  He said that Stoneburner should "wait on the porch while I go inside."  Logan Smith Dep. at 10.  Nor, once Stoneburner nonetheless entered the house, did Logan act as if nothing had happened.  He gave Stoneburner a disapproving look—a "look like why are you coming in the house."  *Id*. at 11.  That presumably is why Stoneburner acknowledges he stopped once Logan saw him inside the house.  Even if the Seventh Circuit's 1988 statement of the relevant parameters of Fourth Amendment law were accurate, a point we need not decide, Smith's case does not fall within them.

B.

Second up is a related but distinct question—whether Stoneburner violated the Fourth Amendment when he entered the house a second time to arrest Charles.  Stoneburner admits that, by reaching across the doorway to grab Charles, he entered the house, and he admits that no one invited him in.  No factual disputes about potential consent thus cloud the resolution of this issue.

Stoneburner faces two presumptions, not one, when it comes to this entry:  the customary presumption against warrantless entries, *Payton*, 445 U.S. at 590, *and* the presumption against warrantless entries to investigate minor crimes or to arrest individuals for committing them, *Welsh v. Wisconsin*, 466 U.S. 740 (1984).  In *Welsh*, a drunk driver swerved off the road, exited his car and walked home.  At the time, driving under the influence was a noncriminal violation in Wisconsin, punishable only by a $200 fine.  When police officers arrived, they entered Welsh's house and placed him under arrest.  Because the government's only interest was "to arrest for a minor offense," the presumption against entry was "difficult to rebut"—and not rebutted there.  *Id*. at 747–48, 753; *see McDonald v. United States*, 335 U.S. 451, 459 (1948) (Jackson,

J., concurring) ("Whether there is reasonable necessity for a search without waiting to obtain a warrant certainly depends somewhat upon the gravity of the offense . . . .").

Whether an investigation concerns a major crime or a minor one, however, exigent circumstances—"hot pursuit" or the potential destruction of evidence—may overcome the presumption against a warrantless entry. *Welsh*, 466 U.S. at 747–48; *Payton*, 445 U.S. at 590. Yet if the presumption against warrantless entries stemming from minor crimes is to have any meaning, the exigency must be a serious one in that context.

Officer Stoneburner cannot meet these stiff requirements. Yes, he had probable cause to believe Charles Smith had committed the misdemeanor crime of third-degree retail fraud. Mich. Comp. Laws § 750.356d(4). But neither type of exigency—hot pursuit or the destruction of evidence—justified a warrantless entry to arrest Charles for this $14.99 crime.

Under the hot pursuit exception, an officer may chase a suspect into a private home when the criminal has fled from a public place. *Warden v. Hayden*, 387 U.S. 294, 298–99 (1967). If, say, a drug dealer runs into a house when police approach her after a controlled buy and after they identify themselves, the officers may follow her into the house to make their arrest. *United States v. Santana*, 427 U.S. 38, 43 (1976). The "pursuit" begins when police start to arrest a suspect in a public place, the suspect flees and the officers give chase. *Cummings v. City of Akron*, 418 F.3d 676, 686 (6th Cir. 2005). What makes the pursuit "hot" is "the emergency nature of the situation," requiring "immediate police action." *Id.*

Stoneburner's entry into the house was neither—neither a "pursuit" nor "hot." Charles voluntarily agreed to talk with Stoneburner, and Stoneburner made no attempt to arrest him when they spoke. At some point, Charles chose to end their conversation and return inside his home. To call that choice "flight" would make a fugitive out of any citizen who exercises his right to end a voluntary conversation with a police officer. In consensual encounters, we think of individuals as "free to leave," not "free to flee." Had

Stoneburner told Charles he was under arrest, and had Charles made a run for it, that might have made a difference. But short of that, or something similar, Charles had the right to "decline to listen to the questions . . . and . . . go on his way." *Florida v. Royer*, 460 U.S. 491, 498 (1983).

Nor at any rate was the pursuit "hot" in any meaningful way. No emergency necessitated "immediate police action." *Cummings*, 418 F.3d at 686. Charles was not armed, a fact Stoneburner knew because Charles had just volunteered to let the officer pat him down to look for the charger. *See Warden*, 387 U.S. at 299; *United States v. Johnson*, 106 F. App'x 363, 367 (6th Cir. 2004). He was not violent. *See United States v. Mayo*, 792 F. Supp. 768, 771–72 (M.D. Ala. 1992). There was no ongoing public nuisance. *See United States v. Rohrig*, 98 F.3d 1506, 1519 (6th Cir. 1996). There was no sign that anyone inside the house was injured or needed emergency aid. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). And Charles had committed no other, more serious, crimes. *See Ingram v. City of Columbus*, 185 F.3d 579, 587 (6th Cir. 1999).

Had Stoneburner remained outside, any risk to the public was remote. Charles would have remained inside the house, a non-violent person alone with a non-violent phone charger. Had they wished to pursue the investigation further, the officers could have contacted a magistrate and secured a warrant. Stoneburner chose instead "to act as his own magistrate" and enter the house, *McDonald*, 335 U.S. at 460 (Jackson, J., concurring), a choice the Fourth Amendment does not permit in this setting.

Also possible, Stoneburner argues, is that Charles might have destroyed the evidence—the part of the phone charger he allegedly took. But to call this a public-safety exigency gives public safety a bad name. The point of *Welsh* is that the possible destruction of evidence of a misdemeanor does not usually suffice to justify a warrantless entry. Otherwise, why invalidate the entry in *Welsh*? That case raised the assured destruction of evidence, in truth the dilution of evidence, as time would have dissipated the alcohol in the defendant's bloodstream before the officers could obtain a warrant, and yet the Court invalidated the entry nonetheless. *See Welsh*, 466 U.S. at 763 (White, J., dissenting). That was the harder case. If we were to uphold a warrantless

entry to arrest someone for stealing a $14.99 phone charger, the *Welsh* presumption would count for naught.

How serious at any rate was the risk of destruction here? There were eyewitnesses to the crime—enough of them indeed to prompt the officers to make an arrest on the spot without recovery of the pilfered charger. Any destruction of evidence at that point would have elevated a minor misdemeanor Charles allegedly committed into the felony of evidence tampering. *See* Mich. Comp. Laws § 750.483a(5)(a), (6)(a). And how does one make a phone charger disappear without leaving the house? A sledgehammer would leave plenty of shards for the police to discover. Hiding the charger in the house was a possibility but hardly a sure thing. Tossing the charger out the window would have accomplished little. This was not Venice. It was canal-free Sturgis, Michigan. And flushing a charger down a toilet—or more precisely trying to flush a charger down a toilet—would be more likely to create new problems than eliminate the one at hand.

Consensual encounters are a traditional tool of law enforcement. But they are not free from risk for individuals *and* officers alike. If the suspect cooperates, the officer may learn useful information that bolsters or even ends the investigation. But if the suspect exercises his right "not to respond or to speak, the investigation will have reached a conspicuously low point, and the [suspect] will have the kind of warning that even the most elaborate security system cannot provide." *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011) (internal quotation marks omitted). Stoneburner's investigation hit that point when Charles returned inside his home, requiring Stoneburner to get a warrant if he wished to make an arrest inside the home.

Smith's rights also were clearly established at the time of the entry. By 2010, *Payton* and *Welsh* had been on the books for more than 25 years, making it clear that a double presumption guarded against warrantless entries into a home to arrest a misdemeanor suspect. Since then, the lower courts have followed what the Supreme Court said—and did—in *Welsh*. Stoneburner cannot point to a case from our court or any other that permitted an entry under circumstances like these. The Tenth Circuit

claims that, as of 2007 "neither the Supreme Court nor this Court [had] ever found an entry into a person's home permissible based merely on the pursuit of a misdemeanant." *Mascorro v. Billings*, 656 F.3d 1198, 1209 (10th Cir. 2011) (footnote omitted). The Ninth Circuit has come close to saying the same thing: "[T]he exigency exception to the warrant requirement generally applies only to a fleeing felon not to a fleeing misdemeanant." *Sims v. Stanton*, 706 F.3d 954, 961 (9th Cir. 2013) (discussing 2008 conduct); *cf. United States v. Washington*, 573 F.3d 279, 289 (6th Cir. 2009) (holding that a warrantless entry in the course of investigating a misdemeanor criminal trespass was unreasonable).

What is generally the case, we recognize, need not invariably be the case. Our unpublished decision in *United States v. Johnson*, 106 F. App'x 363, 368 (6th Cir. 2004), proves the rare exception to the rule. We upheld a warrantless entry in pursuit of a suspect because the misdemeanor at issue—unlawfully discharging a firearm—involved an armed and dangerous suspect. *See id.* Nothing remotely of the sort happened here.

Two appellate decisions, it is true, granted qualified immunity to officers on not-clearly-established grounds, but they each involved a fact pattern at least one prominent step removed from this one. In *Malachowski v. City of Keene*, 787 F.2d 704, 714 (1st Cir. 1986) (per curiam), the officer relied on a state statute that directly authorized the entry. In *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994), the officers entered the home to quell a group of carried-away partygoers resisting arrest. In both cases, the officers confronted situations where their entries were at least potentially justifiable. Not so here. No exigency existed, and no state law authorized Stoneburner's entry. *See People v. Reinhardt*, 366 N.W.2d 245, 248 (Mich. Ct. App. 1985) (holding that a Michigan statute authorizing police officers to enter a home without a warrant to make an arrest for a crime committed in their presence did not extend to misdemeanors). The district court correctly denied qualified immunity and correctly granted summary judgment to the Smiths on Stoneburner's second entry.

C.

Third up is whether Officers Stoneburner and Knapp used excessive force in arresting Charles and shoving Donnetta.  The standard is easy to state and even easy to apply in this instance.  A police officer uses excessive force in arresting a suspect if his actions are objectively unreasonable given the nature of the crime and the risks posed by the suspect's actions.  *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Charles alleges that, in the course of arresting him, the officers banged his head against a wall several times as they held him over the deck railing.  The nature of the offense—a misdemeanor stemming from the alleged theft of a phone charger—gives the officers no quarter.  Shoplifting of this sort offers no reason by itself for banging a suspect's head against a wall.  Nor did the report by Walgreens' employees to the officers about Charles' conduct offer any excuse for this behavior.

That leaves the possibility that Charles brought this confrontation upon himself by physically resisting the officers' attempts to arrest him.  Some testimony supports this theory.  According to Stoneburner, Charles said, "I'm not going," and resisted handcuffing by "stiffen[ing] his back."  Stoneburner Dep. at 45.  But not all of the testimony supports this theory, and that suffices to defeat it.  According to Charles, he said no such thing and he attempted to straighten his back only so that he could breathe.  These dueling accounts create a question of fact about whether Charles resisted arrest.  If he did resist, the officers' force may well have been reasonable.  *See Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012).  If not, they likely crossed the line into the forbidden grounds of excessive force.  *Id.*  On this factual record, the officers are not eligible for qualified immunity.

The same is true of Charles' independent claim that the officers injured his wrist through the gratuitously tight placement of handcuffs.  According to Charles, the officers refused to loosen his handcuffs when asked, and he suffered a sprained wrist as a result.  *Id.* at 41–42.  According to the officers, they loosened the handcuffs when Charles complained.  Stoneburner Dep. at 48–49.  Unduly tight handcuffing may constitute excessive force if the officers ignored the plaintiff's complaints and the claimant

establishes a physical injury from the incident. *Lyons v. City of Xenia*, 417 F.3d 565, 575–76 (6th Cir. 2005). Charles meets both requirements: He claims his pleas for relief went unanswered, and the handcuffs left him wearing a cast for a week. Any dispute about whose account is right is for the jury.

As for Donnetta's excessive force claim, she alleges that Officer Stoneburner shoved her against the side of the house. Here, too, a fact dispute prohibits judicial resolution of the claim. As Donnetta stepped between Stoneburner and Charles while the officers were trying to arrest Charles, Stoneburner's arm collided with her and caused her to hit her head against the side of the house. In Donnetta's eyes, Stoneburner shoved her. In Stoneburner's eyes, he inadvertently bumped her. Gratuitous shove? Or inadvertent bump? The answer makes a difference, and it too falls within the bailiwick of the jury. The district court correctly denied the officers' request for qualified immunity.

## D.

Fourth up is a state law claim—whether the officers committed intentional torts against the mother and son. Michigan law insulates police officers from intentional-tort lawsuits if they acted within the scope of their employment, if their actions flowed from discretionary rather than ministerial duties and if they acted in good faith. *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008). Only the last element, good faith, is in play. Unlike federal law, governmental immunity in Michigan is "subjective in nature": It "protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Id.* at 229.

At this stage in the litigation, a reasonable jury could conclude that the two officers acted in bad faith. If, as the Smiths allege, the officers banged Charles' head against a wall, refused to loosen his cuffs when asked and gratuitously shoved Donnetta, a reasonable jury could find that they acted maliciously. If, as the officers allege, Charles resisted arrest, the officers loosened his cuffs when asked and inadvertently

bumped Donnetta, a reasonable factfinder could find they acted in good faith.  This claim also presents a jury question.

III.

For these reasons, we affirm.