**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0683n.06

Case Nos. 14-2272/14-2317

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Oct 08, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ELITE INTERNATIONAL ENTERPRISE, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff-Appellee/Cross-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| NORWALL GROUP, INC.; PATTON | ) | |
| WALLCOVERINGS, INC., | ) | |
| | ) | |
| Defendants-Appellants/Cross-Appellees. | ) | |

BEFORE: SILER, COOK, and WHITE, Circuit Judges.

COOK, Circuit Judge. Patton Wallcoverings, Inc.,[1] a wallpaper manufacturer, breached its distributing contract with Elite International Enterprise, Inc. by refusing to supply Elite with certain products. Elite sued and obtained a grant of summary judgment as to liability. After a bench trial on the question of damages, the district court awarded Elite $222,465.01 in lost profits. The amount satisfied neither party, and both appealed. Patton argues that the district court erroneously awarded Elite lost profits, improperly calculated those lost profits, and abused its discretion in finding that Elite reasonably mitigated its damages. Elite, for its part, argues that the court erred in granting partial summary judgment to Patton on Elite's contract claim and in

---

[1]Norwall Group, Inc., a Canadian wallpaper manufacturer, is also named as a party. Patton purchased Norwall in 2010, and Norwall is no longer in operation.

failing to award greater damages. We AFFIRM the court's grant of partial summary judgment to Patton on Elite's additional contract claim, VACATE its damages award and REMAND for recalculation.

I.

This contract dispute follows a falling out between Rami Kseri, the owner of Elite International, and James Patton, the owner of Patton Wallcoverings. The two began working together in 2006. Kseri, then working for his father's company, Kuwait Decoration Exhibition (KDE), became a sales agent for Patton in the Middle East region. As an agent, Kseri located buyers who would purchase directly from Patton. He received a commission on successful sales. Patton set the maximum price at which KDE could sell its products at $8.55 per roll. From 2007 to 2009, Kseri achieved annual sales of $256,093, $473,557, and $448,896.

When Patton's agency contract with KDE expired in March 2010, Kseri's own unrelated company, Elite, became a Patton distributor. Under this new arrangement, Elite bought directly from Patton, set the resale price itself, and resold products to customers. Elite and Patton formalized their arrangement in March 2011. The new contract designated Elite as both a sales agent and a distributor of Patton products. Kseri testified that Elite sold products at an average price of $15 per roll.

Elite endured a rocky tenure as a Patton distributor, beset by ongoing problems including back orders, delays in introducing new products, and Patton discontinuing certain product lines. Elite sold the bulk of its product to two buyers: AsioAfrican, an Egyptian company Kseri had helped establish, and KDE, Kseri's father's company. Elite sold to KDE at cost, meaning it realized no profit on its sales of $64,604 and $44,393 to KDE in 2011 and 2012, respectively. AsioAfrican began buying directly from Patton in March 2011.

During this time, Patton also established a relationship with DID Wallcoverings, a South Korean company with around 140 employees and global annual sales of $60 million. DID became both a manufacturer and a distributor of Patton products in 2010. The companies' agreement permitted DID to sell Patton products in Asia and the Middle East. The contract prevented DID, however, from selling to other Patton distributors (like Elite). DID devotes significant resources to developing business in the Middle East: it employs three dedicated Patton sales agents who make week-long visits to the Middle East twice a month and maintains an extensive presence at an annual international trade fair.

On August 25, 2011, Patton sent Elite an email explaining that Elite would be limited to selling only existing product lines. The district court held—and Patton no longer disputes—that Patton breached the contract by doing so. Elite ordered forty-four rolls of wallpaper from Patton following the breach, with the last order on September 27, 2012. In late 2011, Elite tried to order directly from DID, but was rebuffed due to the terms of DID's distribution agreement with Patton.

Elite sued Patton for breach of contract. The district court, applying Michigan law, found that the August 25 email constituted a breach and granted partial summary judgment to Elite. It granted partial summary judgment to Patton on the remainder of Elite's claims, including the claim that Elite had an exclusive distribution agreement that Patton breached by selling directly into the Middle East market.

Following a three-day bench trial on the question of damages, the district court determined that Patton's breach entitled Elite to lost profits. To estimate those profits, the court "construct[ed] a[n] analytical framework within which Elite was still able to freely place orders with [Patton] or DID for . . . product for sale in the Middle East." The court assumed that "if

Elite [were] still operating optimally, it would have had a two-thirds chance of being the buyer for every sale that DID made into the Middle East and then turning around and successfully reselling the product at the $15 average sales price." It reasoned that "all other things being equal, it [*sic*] more likely than not, although not a certainty, that when [Patton] and/or DID sought to make sales in the Middle East, Elite would have been the first entity approached regarding the sale."

Using this method, the district court awarded Elite $222,465.18 in damages. This number reflected "74,493 rolls of wall paper sold by DID in the region at Elite's $15 average sales price, with a 50% profit margin and 66.6667% sales probability" less "Elite's average annual fixed costs over the three year term of the contract ($150,000.00)." The court declined to award Elite any damages for sales in India, as "the evidence d[id] not support a finding that Mr. Kseri had even the beginnings of a foothold" there. The court also rejected Patton's argument that Elite failed to mitigate its damages. Elite appealed from the court's earlier grant of partial summary judgment to Patton, and both parties appealed from the damages award.

## II.

We first consider Elite's challenge to the court's grant of partial summary judgment to Patton. In short, Elite seeks to revive its claim that Patton also breached the distribution contract by selling into the Middle East both directly and through DID. The court granted partial summary judgment to Patton on this claim after finding that the agreement did not name Elite as the exclusive distributor of Patton products in the Middle East. We review the court's decision de novo, viewing the facts in the light most favorable to the non-moving party. *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013). Summary judgment is proper "if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Elite argues that it "presented a factual basis for concluding that the . . . contract gave it exclusive distributorship rights," and that "the contract was, at a minimum, ambiguous." But as the district court held, the contract uses the word "exclusive" in reference to Elite's status as sales agent but not its status as distributor. The contract provides:

> Whereas, [Elite] is the permanent and sole exclusive agent for all wall covering Products on behalf of [Patton] for export and sale within the Sales Territory as set out below, hereinafter referred to as the "Sales Territory" and

> Whereas, [Patton] agrees to appoint [Elite] its distributor for the Sales Territory as defined herein and under the terms and conditions hereinafter set forth . . . .

As the court reasoned, the distributorship language contains "no mention of exclusivity, and any inference of exclusivity arising from the use of the word 'its' as opposed to say 'a' or 'one' is undercut by the fact that in the previous section of the contract the parties expressly used exclusivity language." Moreover, Kseri himself testified that he dedicated a significant amount of time to establishing other distributors in the Middle East such as AsioAfrican. "Such activity demonstrates an understanding by the parties that the contract does not provide for an exclusive distributorship."

Nor did Elite's exclusive agency grant it an exclusive right to sell. Recognizing that the Michigan Supreme Court has yet to speak directly to the issue, the district court predicted that Michigan would adopt the distinction between an exclusive agency and an exclusive right to sell "given its widespread acceptance and conceptual soundness." *See also Grantham & Mann, Inc. v. Am. Safety Prods., Inc.*, 831 F.2d 596, 608 (6th Cir. 1987) ("If the forum state's highest court has not addressed the issue, the federal court must ascertain from all available data, including the decisional law of the state's lower courts, restatements of law, law review commentaries, and

decisions from other jurisdictions on the 'majority' rule, what the state's highest court would decide if faced with the issue."). "[T]o find that a principal has no right to sell its own products, the agency contract must plainly so state." *Alexander Assocs., Inc. v. FCMP, Inc.*, No 10-12355, 2012 WL 1033464, at *9 (E.D. Mich. Mar. 27, 2012). The court rightly rejected Elite's objection that this distinction is hyper-technical, as ''[m]ost jurisdictions distinguish between [the] two types of exclusive representation agreements." *Roberts Assocs., Inc. v. Blazer Int'l Corp.*, 741 F. Supp. 650, 656 (E.D. Mich. 1990). It then concluded that Patton did not breach the contract by selling its own products in the Middle East because the contract did not plainly confer Elite an exclusive right to sell. Elite offers no persuasive justification to depart from the court's well-reasoned opinion.

## III.

We next consider the parties' challenges to the damages award. "Awards of money damages are reviewed under an abuse of discretion standard." *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 517 (6th Cir. 2009). "A court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *United States v. City of Warren*, 138 F.3d 1083, 1096 (6th Cir. 1998) (citation and internal quotation marks omitted).

Michigan contract law counsels that an award of damages should put the injured party in the position it would have been but for the breach. *See Demirjian v. Kurtis*, 91 N.W.2d 841, 843 (Mich. 1958). "In order to recover prospective profits, a plaintiff must establish proof of lost profits with a reasonable degree of certainty." *Joerger v. Gordon Food Serv., Inc.*, 568 N.W.2d 365, 369 (Mich. Ct. App. 1997). But "as in all cases, the [factfinder] should not be allowed to

speculate or guess with regard to the amount of loss of profits." *Id.* (citations and internal quotation marks omitted).

Patton contests the district court's damages award in three ways. First, it argues that the court erred in deciding that Elite was entitled to lost profits at all. Second, it contends that even if Elite is entitled to recover lost profits, the court abused its discretion in using DID's sales figures to estimate them. And third, Patton attacks the court's finding that Elite acted reasonably to mitigate damages.

Elite responds to Patton's detailed and well-supported arguments by offering only conclusory assertions that the court did not err. While Elite's counsel offered a more robust defense of the court's reasoning at oral argument, Elite waived its arguments on this front by failing to develop them in its brief. *See, e.g.*, *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (internal quotation marks omitted)). As the appellant, however, Patton retains the ultimate burden of showing that the lower court erred.

*A. Lost Profits Award*

Patton first argues that Elite did not prove lost profits with reasonable certainty.[2] Due to this failing, Patton maintains that "the District Court was forced to resort to rank speculation in

---

[2]In its brief, Patton argues under separate heading that Elite should be considered a "new business." The Michigan Supreme Court has clarified, however, that it imposes no special rule for new businesses; rather, the so-called new-business rule "is merely an application of the doctrine that '[i]n order to be entitled to a verdict, or a judgment, for damages for breach of contract, the plaintiff must lay a basis for a reasonable estimate of the extent of his harm, measured in money.'" *Fera v. Vill. Plaza, Inc.*, 242 N.W.2d 372, 373–74 (Mich. 1976) (alteration in original) (quoting 5 Corbin on Contracts § 1020). Patton's "new business"

order to award lost profit damages." Patton identifies three instances of the court's speculation: (1) using a profit margin of fifty percent when Elite's tax returns establish a true profit margin of twenty-four percent; (2) attributing Elite's sales decline to Patton's breach rather than Elite's pre-breach loss of major customers; and (3) finding that Elite was unable to obtain "sales books" following the breach when in fact Elite simply did not wish to pay for additional printings according to Patton's routine policy.

Although these criticisms of the court's chosen damages-calculation *method* have some merit, they fail to show that the court abused its discretion in choosing to award lost profits *at all*. As the court noted, under Michigan law, "[t]he type of uncertainty which will bar recovery of damages is 'uncertainty as to the *fact* of the damage and not as to its *amount* . . . [since] where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery.'" *Bonelli v. Volkswagen of Am., Inc.*, 421 N.W.2d 213, 226 (Mich. Ct. App. 1988) (emphasis added) (quoting *Wolverine Upholstery Co. v. Ammerman*, 135 N.W.2d 572, 576 (Mich. Ct. App. 1965)). The evidence, including Elite's tax returns, supports the court's finding that Elite ran a profitable business and that its sales declined following the breach. The district court thus did not abuse its discretion in concluding that Elite suffered some lost profits.

*B. Lost-Profits Calculation*

Patton argues in the alternative that even if Elite is entitled to lost profits, the district court abused its discretion in calculating Elite's damages. Specifically, Patton contends that the district court erred in basing its damages award on DID's sales figures rather than Elite's. *Cf. Joerger*, 568 N.W.2d at 369–70 (looking first to the plaintiff's own past-profit data when considering damages). In using DID's sales data instead of Elite's, the court relied on *Bero*

argument thus rises and falls with its self-styled alternative argument: that Elite failed to prove lost profits with reasonable certainty.

*Motors, Inc. v. Gen. Motors Corp.*, No. 257675, 2006 WL 2312182 (Mich. Ct. App. Aug. 10, 2006), for the proposition that "using sales data of competitors or from other markets [is] acceptable in making a final determination on damages, so long as the sales data used [is] not itself speculative."

Even if courts properly may use a competitor's sales data, Patton maintains that the district court erred in using DID's sales figures because DID is not a similar business. In *Bero Motors*, an established car dealership owner proved lost profits from the Town & Country dealership it intended to open by adducing evidence of sales from nearby Town & Country dealerships. *See Bero Motors*, 2006 WL 2312182 at *8. DID, both a distributor *and* a manufacturer, "is a giant in the wallcovering business, with global connections, approximately 140 employees, and annual sales of $60 million." Elite, by contrast, counts Kseri as its sole employee and operates out of Kseri's Michigan video-rental store.

Given these stark differences, Patton persuasively argues that the current case looks less like *Bero Motors* than it does *Joerger v. Gordon Food Serv., Inc.*, a published Michigan Court of Appeals decision. In *Joerger*, the plaintiff's business bought food at wholesale prices from the defendant and resold it to schools and churches. The plaintiff tried to establish lost profits by using data from a rival company that owned its own warehouse and handled its own deliveries. But the trial and appellate courts agreed on the incongruity of the rival company's data because these "were not identical business operations . . . [given that the plaintiff] relied on defendant to supply and deliver the grocery items." *Joerger*, 568 N.W.2d at 370. Similarly, DID's sheer size and additional role as a manufacturer undermine the district court's decision to use its sales figures to estimate Elite's damages; DID and Elite are not "identical business operations." *Id.*

Patton highlights a second problem with the district court's methodology: despite purportedly relying on competitor sales data, the court treated DID not as a competing distributor but as a supplying manufacturer. The court "construct[ed] a[n] analytical framework within which Elite was still able to freely place orders with [Patton] or DID." It envisioned a world in which Elite was the buyer for two out of every three sales DID made in the Middle East. This method departs from *Bero Motors*, where the court used sales data from a comparable dealership at the same step in the supply chain to estimate the plaintiff's damages. More importantly, it also fails to appreciate that DID was contractually prohibited from selling to Elite.

The court thus sidestepped Michigan law in two respects: first, by erroneously concluding that DID and Elite were sufficiently similar to allow the court to use DID's sales figures; and second, by treating DID as a supplier rather than a direct competitor of Elite. Instead, as Patton maintains, the court should have restricted itself to using Elite's actual sales data to estimate its lost profit. According to Elite's tax returns, Elite earned a net profit of $71,814 in 2011 (the year of the breach) and $50,986 in 2012 (the first full year after the breach). Patton proposes that the correct measure of damages accounts for the difference between the two years' profits ($20,828) and multiplies that difference by the 2.512 years remaining on the contract at the time of the breach. This method produces a damages figure of $52,319.94.

Though Patton's method uses Elite's actual sales data, it too includes potential flaws. It fixes Elite's 2011 net-profit figure as the baseline for determining damages, ignoring the possibility that Elite would have earned more than $71,814 in net profit in 2011 had the breach not occurred mid-year. Moreover, the district court found Patton's breach derailed Elite's potential sales relationships with Middle East buyers, and thus, it seems likely the court would find that Elite would have earned more profit over time.

Rather than using Elite's own sales data, the dissent urges the court on remand to compare Elite to sub-distributors like Excel Dubai, which also purchased Patton products from suppliers. But, like the parties, the dissent fails to identify any sub-distributor sales data in the record. As a matter of principle, the dissent's proposed damages calculation complies with Michigan law. As a matter of evidence in the record, however, it finds no support.

Accordingly, we VACATE the district court's award of damages and REMAND for recalculation using Elite's own sales data in the first instance.

*C. Mitigation*

Last, Patton argues that the district court erred in finding that Elite reasonably mitigated its damages. Following a breach of contract, Michigan law requires injured parties to "use 'such means as are reasonable under the circumstances to avoid or minimize the damages.'" *Retained Realty, Inc. v. Mich. Pioneer Title Ins. Corp.*, 472 F. App'x 361, 364 (6th Cir. 2012) (quoting *Shiffer v. Bd. of Educ. of Gibraltar Sch. Dist.*, 224 N.W.2d 255, 258 (Mich. 1974)). The district court found that "Mr. Kseri scrambled to limit his exposure" following the August 25 email. It pointed to Elite's attempt to purchase directly from DID as "a clear attempt at mitigation" and rejected the suggestion that Elite realistically could have made up the difference by selling other wallpaper brands.

Patton, however, minimizes Elite's attempt to buy from DID by noting again that DID could not contractually sell to Elite. It also suggests various actions Elite could have taken to better mitigate its damages, such as renegotiating its zero-profit arrangement with KDE, continuing its sales efforts with the Patton products still available to Elite, or attempting to secure an agency or distributorship with another wallcovering manufacturer. Whatever the merits of these suggestions, they fail to show that the district court clearly erred in finding that Elite met its

minimal burden to mitigate damages. *See Retained Realty*, 472 F. App'x at 364 ("[A] 'claimant's burden [to show mitigation] is not onerous.'" (quoting *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 27 (Mich. 1994))). Moreover, Patton fails to show the district court erred in finding that Patton's "act of cutting off the new products predictably resulted in Elite's customers losing interest and taking their business elsewhere, thereby destroying Elite's ability to sell even the older products."

*D. Elite's Cross-Appeal*

Elite also attacks the court's damages award, maintaining that the court improperly calculated Elite's annual expenses and erred in refusing to award damages for India and Africa. But given our decision to vacate the court's award and remand for recalculation, we need not reach the merits of these arguments.

IV.

For the foregoing reasons, we AFFIRM the district court's award of partial summary judgment to Patton, VACATE its damages award and REMAND for recalculation of damages using Elite's own sales data.

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.**

I concur in the majority opinion except with regard to the damage award, as to which my concerns differ from the majority's.

I do not agree that the district court sidestepped Michigan law "by erroneously concluding that DID and Elite were sufficiently similar to allow the court to use DID's sales figures," and "by treating DID as a supplier rather than a direct competitor of Elite." Maj. Op. at 10-11. Nor do I agree that the district court should have restricted itself to using Elite's actual sales data to estimate its lost profit.[1] *See id.* at 11. It is not material whether DID and Elite are similar businesses. The district court limited its comparison of DID and Elite to the relevant products in the relevant market. Further, it does not appear DID was a "giant" in the Middle East any more than Elite was. Additionally, the court constructed an analytical framework within which Elite could place orders with Patton or DID for products to sell in the Middle East.[2] This analytical framework, which does not treat DID as a competitor, but as a supplier, is supported by the evidence, which demonstrates that DID's sales were largely to other distributors (i.e., sub-distributors, such as Excel Dubai), at an average price of $7.50 to $8 per roll. The analytical framework constructed by the district court treats Elite as a competitor of these local distributors, bringing the product into the Middle East by buying it from DID or Patton at $7 to $8 per roll and selling it to customers in the Middle East for $15 per roll. Moreover, the district court had good reason not to use Elite's sales data because, as the majority observes, the data does not account for Elite's likely growth. Lastly, it was reasonable for the district court to look to actual

---

[1] As to the court's finding of a 50% profit margin, there is no error. The record adequately supports that Elite has relatively constant operating costs of $50,000, which are incurred without regard to the number of rolls sold.
[2] The majority finds it significant that DID was contractually prohibited from selling to Elite. *See* Maj. Op. at 10. However, that restriction was imposed by Patton and should not affect our analysis.

sales into the market as an accurate reflection of sales available in the market. Thus, I find no error in the reasoning found faulty by the majority.

Still, the district court's analysis breaks down with its finding that Elite would have earned two-thirds of the sales into the Middle East market based on Kseri's substantial efforts to cultivate the market and his knowledge of the language and culture. In describing Elite's advantages in the region, the district court compared Elite to DID, rather than the local first buyers/ distributors. This is inconsistent with the district court's analytical framework, which treats Elite not as DID's competitor in the Middle East market, but as a competitor of local DID sub-distributors. I would therefore vacate the two-thirds finding and remand for a re-determination of Elite's likely sales.[3]

Finally, I note that the district court could have taken any number of approaches to compute Elite's damages under Michigan law, as long as the data used was not speculative, *Bero Motors, Inc. v. Gen. Motors Corp.*, No. 257675, 2006 WL 2312182, at *8 (Mich. Ct. App. Aug. 10, 2006), and the lost profit was proved with a reasonable degree of certainty. *See Joerger v. Gordon Food Serv., Inc.*, 568 N.W.2d 365, 369 (Mich. Ct. App. 1997). The district court could have used the approach outlined by the majority and attempted to extrapolate from Elite's existing sales, but it was also free to take the approach it took, focusing on sales into the relevant territory and what percentage of those sales would have been garnered by Elite if it had been allowed the access to merchandise contemplated by the contract. Under any framework chosen, however, the district court must be consistent in its analytical approach. Because the court was not consistent in its analysis here, I agree that the case must be remanded.

---

[3] I do not agree that the district court could not predict Elite's lost sales without having the sales figures of the other local distributors. The court had figures regarding total sales into the market and could allocate a proportional share to Elite. What it could not do was allocate two-thirds of the sales to Elite without a reason for doing so based on the evidence.