THAPAR, Circuit Judge. Parents often tell their children social media can cause problems. This case is proof of that. A few texts and a Facebook post may not seem like much. But when sent to an ex-girlfriend, who has a personal protective order out against you, both are ill-advised. Dennis Brenay, Jr. learned this lesson the hard way — when he contacted his ex-girlfriend, she called the Bay City Police. Officer Troy Sierras and Sergeant Michael Schartow responded to the call and ultimately ended up on the Brenays’ porch. When they rang the bell, Dennis Brenay, Sr. answered, agreed to get his son, and returned a minute later with his wife and Brenay, Jr. in tow. Brenay, Sr. opened the glass storm door, but remained inside. Brenay, Jr. stood behind his father, six inches from the door, a foot from the outside, and a “few feet” from Officer Sierras. R. 40-3, Pg. ID 594. Linda Brenay stood behind her son — the family of three huddled in a cramped foyer. The officers asked Brenay, Jr. to come onto the porch several times, but he declined; the porch was wet and he had no shoes. So the officers began to question Bre-nay, Jr. through the doorway. Brenay, Sr. and Linda Brenay each attempted to interject over the next several minutes. Brenay, Sr. even asked if he could pose a question to the officers. But, he says, Officer Sierras rebuffed him: “No, I’m talking to your son.” R. 42-5, Pg. ID 701. What happened next depends on who you ask. To the Brenays, Officer Sierras appeared to be “pump[ing] himself up” for a confrontation — calling Brenay, Jr. a “fling coward ... [hjiding behind [his] f-ing mom and dad.” R. 40-4, Pg. ID 607; R. 42-5, Pg. ID 702. Frustrated by Officer Sierras’ attitude, Brenay, Sr. declared “that’s enough” and told his son to call his lawyer. R. 40-2, Pg. ID 581. He also raised his arms in exasperation and let go of the storm door. As the door swung shut and Brenay, Jr. retreated back into the house, chaos ensued. Both. Brenay, Sr. and Sergeant Schartow reached for the door handle to keep the door ajar. In the process, Sergeant Schartow “ripped” the door from Brenay, Sr.’s hands. R. 42-5, Pg. ID 701. Officer Sierras then “lunged” through the doorway and grabbed Brenay, Jr. by the wrist. R. 42-6, Pg. ID 751. In the process, he “body slam[med]” Brenay, Sr. into the wall. R. 42-5, Pg. ID 701. Brenay, Sr. began to fall, and — in an attempt to catch himself — reached out and “grabbed somebody’s arm.” Id. at Pg. ID 702. Officer Sierras continued into the hallway, where he and Brenay, Jr. began to struggle. Sergeant Schartow soon joined them, “jump[ing] over” Brenay, Sr. and striking him in the stomach and groin. Id. at Pg. ID 703. As the parties wrestled, Brenay, Jr. felt someone deploy a taser into his arm. Eventually, the officers pinned Bre-nay, Jr. down and handcuffed him. Linda Brenay asked Sergeant Schartow “what right' he had coming into [their] house [ ] without a warrant or anything.” R. 42-6, Pg. ID 756. Sergeant Schartow responded: He could come into their house “any time he want[ed].” Id. The officers tell a very different story. According to them, the Brenays tried to obstruct their son’s arrest. Yes, Officer Sierras reached through the doorway and grabbed Brenay, Jr., but only because Brenay, Sr. moved to close the-door when the officers told Brenay, Jr. that he was under arrest. Officer Sierras says that once he crossed the threshold, the Brenays tried to pull their son deeper into the hallway. Brenay, Sr. even tried to “get in between” them during the scuffle — he tried to “push his son back into the house,” and when that failed, “to push Officer Sierras away.” R. 42-4, Pg. ID 680. Sergeant Schartow, meanwhile, says Brenay, Jr. pulled him into the residence when he intervened in the scuffle. Either way, the officers eventually handcuffed Brenay, Jr. and led him away. But they were not done with Brenay, Sr. Officer Sierras authored a police report for his department, and Sergeant Schartow signed off on another report. Both accused Brenay, Jr. of resisting arrest and Brenay, Sr. of interfering with his son’s arrest. The Bay City Prosecutor’s Office charged father and son with a felony for obstructing a police officer. Both later prevailed at trial — Brenay, Sr. before the jury; Bre-nay, Jr. at directed verdict. After the trial, Brenay, Sr. and Linda Brenay sued Officer Sierras and Sergeant Schartow under 42 U.S.C. § 1983. They accused the officers of unlawfully entering their house, using excessive force, and maliciously prosecuting Brenay, Sr. — all in violation of the Fourth Amendment. Officer Sierras and Sergeant Schartow each mounted qualified-immunity defenses at summary judgment and prevailed. Now on appeal, the Brenays drop their excessive-force claim but press the remaining two. I. Whether Officer Sierras and Sergeant Schartow are entitled to qualified immunity turns on two questions: Did they violate Brenay, Sr.’s and Linda Brenay’s constitutional rights? And if so, were those rights clearly established at the time? Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). If the answer to either question happens, ,to be “no,” then the officers are not liable. Still the Brenays have a few advantages at this stage. No jury has yet decided which story to believe. So in answering these questions, we must view the facts in the light most favorable to the Brenays and draw all reasonable inferences in their favor. Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). And unlike the officers, the Brenays do not have to prove they are entitled to judgment as a matter of law. Fed. R. Civ. P, 56(a). All the Brenays have to show is that a reasonable jury, accepting their version of the story as true, could conclude that the officers violated their clearly established rights. Scott, 550 U.S. at 380, 127 S.Ct. 1769. A. The government is not your nosy neighbor — the one who always pokes her head in, uninvited, to critique your garden or gossip about the couple down the street. Sure, the police, like any Girl Scout, may approach your door, knock, and ask you a question or two. See United States v. Thomas, 430 F.3d 274, 277 (6th Cir. 2005). But the Fourth Amendment draws a “firm line” at the door. Payton v. New York, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); see also United States v. U.S. Dist. Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (“[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed!.]”). If the government wants inside, they need a warrant, consent, or an exigent circumstance to justify their entry. Cummings v. City of Akron, 418 F.3d 676, 685 (6th Cir. 2005). Sergeant Schartow'has an easy out: The Brenays seem to have forgotten all about him. The Brenays contend that Officer Sierras had no business entering their home without a warrant. But the Brenays do not mention Sergeant Sehartow. Their silence forfeits any unlawful-entry claim against him. See Kuhn v. Washtenaw Cty., 709 F.3d 612, 624 (6th Cir. 2013). Officer Sierras, on the other hand, does not get off so easy. He could have obtained a warrant, but chose not to do so. An invitation to come inside would suffice, but Brenay, Sr.’s declaring “that’s enough” and letting the door swing shut did not exactly shout, “Come on in!” See Cummings, 418 F.3d at 685 (explaining that a homeowner’s attempt to close his partially open front door was a sign that he “wished to end his conversation with the officers”). So he must prove that his conduct fell within one of the other “few,” “carefully delineated” exigency exceptions to the warrant requirement. Welsh v. Wisconsin, 466 U.S. 740, 749-50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), That is a rather “heavy burden,” made heavier still by our reluctance to sanction warrantless intrusions into a home for misdemeanor arrests like this. Id. at 749, 753, 104 S.Ct. 2091; Mich. Comp. Laws Ann. § 600.2950(23) (defining failure to comply with a personal protective order as a misdemeanor). Only a handful of exigencies can justify a war-rantless entry into a home, and most do not apply to this case. See Johnson v. City of Memphis, 617 F.3d 864, 868 (6th Cir. 2010). There was no reason to believe Brenay, Jr. meant to escape or to harm another when he went to call his lawyer. Nor was Brenay, Jr. likely to destroy evidence while the police waited on a warrant; the officers had seen his messages, copies of which his ex-girlfriend possessed. That leaves only the “hot pursuit” doctrine. If an officer initiates an arrest in a public place, but the suspect flees into a private one, the officer may give chase without stopping for a warrant. See Smith v. Stoneburner, 716 F.3d 926, 931 (6th Cir. 2013). In other words, a suspect may not defeat an arrest by simply running inside. United States v. Santana, 427 U.S. 38, 43, 96 S.Ct 2406, 49 L.Ed.2d 300 (1976). Whether the hot pursuit doctrine applies to this case depends on whether Brenay, Jr. was standing in a public place when Officer Sierras told him that he was under arrest. We know that Brenay, Jr. was standing in the foyer, six inches from the open doorway, for most of his interaction with the officers. The Supreme Court has said that a person who stands in his front doorway ’stands in a public place because he is “as exposed to public view, speech, hearing, and touch as if [he] had been standing completely outside [his] house.” Id. at 42, 96 S.Ct. 2406. But this circuit has not addressed whether a person who opens his door voluntarily to talk to police loses his reasonable expectation of privacy within the meaning of Santana. Our sister circuits are split on the issue. See Wayne LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 6.1(e) (5th ed. 2016). And how the analysis might change when the person is standing six inches back from the doorway is even less settled. If this appeal came down to these questions, it would be easy. Government officials are entitled to qualified immunity unless “existing precedent ... placed the statutory or constitutional question beyond debate.” Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). With so many answers outstanding, how Santana would apply to this case is hardly “beyond debate.” That the officers violated the Brenays’ constitutional rights when they entered the Brenays’ home would not be clearly established. Unfortunately for Officer Sierras, the hot pursuit doctrine may not apply because Brenay, Jr. may have ended his interaction with the police before Officer Sierras told him he was under arrest. Linda Brenay testified that Officer Sierras never even told Brenay, Jr. that he was under arrest. And the police report Officer Sierras submitted stated that he yelled, “He’s under arrest!” and ordered Brenay, Jr. outside only after his father attempted to shut the door. R. 42-4, Pg. ID 678. Officer Sierras later testified even more clearly. When asked whether he had announced that Brenay, Jr. was under arrest before the door started to close, Officer Sierras said: “As soon as he started to shut the door, I said, no, he’s coming with me, he’s under arrest, and I tried to block the door from being shut.” R. 40-3, Pg. ID 601. Officer Sierras’ testimony also indicates that Brenay, Jr. had “started to turn to leave to retreat back into the house” before he told him he was under arrest. Id. at Pg. ID 602; see also R. 40-2, Pg. ID 681 (“Dad says, that’s enough, goes to shut the door. I block the door with my left hand. Dennis, Jr,, is now going to go back into the house. I said, no, he’s coming with us. I grab Dennis’[s] arm, then I tell him he’s under arrest.” (emphasis added)). If these facts are true, the officers’ attempt to follow Brenay, Jr. inside would not have been a “pursuit" within the meaning of Stoneburner, 716 F.3d at 931. The reason is straightforward. Unless and until Officer Sierras initiated an arrest, the Brenays were free to shut the door and walk away. Montejo v. Louisiana, 556 U.S. 778, 795, 129 S.Ct. 2079, 173 L,Ed.2d 955 (2009); see also Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). And they tried to do just that: Brenay, Sr. said “that’s enough,” he let go of the door, which began to swing shut, and Brenay, Jr. began to walk off to call his lawyer. To call any of these choices “flight” — in the absence of proof that Officer Sierras had already made his intentions known — “would make a fugitive out of any citizen who exercises his right to end a voluntary conversation with a police officer.” Stoneburner, 716 F.3d at 931 (also providing that “(i]n consensual encounters, we think of individuals as ‘free to leave,’ not ‘free to flee’”). So if Officer Sierras initiated Brenay, Jr.’s arrest and reached through the door only after the Brenays tried to retreat back inside, then there is no question that he violated their clearly established rights. Id. at 931-33 (holding that an officer violated a suspect’s clearly established rights by grabbing him through a door after he had returned inside, because the officer had not told the suspect he was under arrest while they talked outside); Cummings, 418 F.3d at 685-87 (similar). We cannot say for certain what happened at the Brenays’ front door. But we also do not need to. At summary judgment, we do not decide which version of the facts is accurate. All that matters is that, accepting the account most favorable to the Brenays, a reasonable jury could conclude that Officer Sierras violated the Brenays’ clearly established rights by entering their home without any warrant, consent, or exigency. Whether he actually did so “is the epitome of a triable issue of fact, one over which our authority recedes and the jury’s takes over.” Stonebumer, 716 F.3d at 930 (citation omitted). We therefore reverse the district court’s decision granting summary judgment in favor of Officer Sierras on the Brenays’ unlawful-entry claim. See Hall v. Shipley, 932 F.2d 1147, 1154 (6th Cir. 1991) (“[Summary judgment is inappropriate on this issue because there are factual disputes on which the issue of immunity turns such that it cannot be determined before trial whether the officers did acts which violate clearly established rights.”). B. Warrantless entry is the feature film in the Brenays’ brief. That makes malicious prosecution the credits that roll by quickly at the end. In these credits, the Brenays tell us that when the district court granted the officers’ motion for summary judgment, it improperly decided that any misrepresentations in the officers’ reports were not intentionally or recklessly made. They tell us that this question should have been left to the jury. But they do not tell us why. Their malicious-prosecution claim is thus forfeited.[1] To reach a jury, the Brenays need to show that the officers’ statements were “so far off the mark” as to permit an inference of deliberate or reckless disregard for the truth. Newman v. Twp. of Hamburg, 773 F.3d 769, 772 (6th Cir. 2014) (quoting Hutsell v. Sayre, 5 F.3d 996, 1004 (6th Cir. 1993)). In their briefing, the Brenays take issue with two statements in the officers’ reports. In both, the officers accuse the Brenays of intervening in the scuffle and trying to pull Brenay, Jr. back into the house. The Brenays insist that “[tjhese facts are simply untrue,” and that without them, “the affidavit in support of the arrest warrant would lack probable cause.” Appellant Br. 24. But as to whether the officers acted with deliberate or reckless disregard for the truth, the Brenays tell us only that “this [was] a question for the jury.” Id. We routinely decline to consider perfunctory arguments of this sort. See McPherson v. Kelsey, 125 F.3d 989, 995 (6th Cir. 1997) (holding that “[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived” (quoting Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm’n, 59 F.3d 284, 293 (1st Cir. 1995))). It is not enough for a party to “mention a possible argument in the most skeletal way” and leave the court to “put flesh on its bones.” Id. at 995-96 (quoting Citizens Awareness Network, 59 F.3d at 293-94). The Brenays were obligated to explain how a reasonable juror could infer the officers’ culpability. Fed. R. App. P. 28(a)(8) (“The appellant’s brief must contain ... [the] appellant’s contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies[.]”). But their brief makes no attempt to do so. Instead, they spend several pages reciting the elements of a malicious-prosecution claim, noting that some of those elements were uncontested, and. asserting that the officers made false statements. None of those points, however, advances an argument on the question they have asked this court to review: whether there.exists a genuine dispute of material fact as to whether the officers acted with deliberate or reckless disregard for the truth. They leave it to the court to seek out the relevant law, identify the relevant evidence, and develop their argument for them. And indeed, in his thoughtful dissent, Judge Clay does much to develop the argument that the Brenays presumably had in mind. But it is not for the court to search the record and construct arguments. Parties must do that for themselves. Magnum Touting & Recovery v. City of Toledo, 287 Fed.Appx. 442, 449 (6th Cir. 2008). Demanding this much from the parties is not a new proposition or one that is unique to this court. See, e.g., Elite Int’l Enter., Inc. v. Norwall Grp., Inc., 628 Fed.Appx. 370, 374 (6th Cir. 2015) (holding that because a party offered “only conclusory assertions,” it “waived its arguments on this front by failing to develop them in its brief’); Operating Eng’rs Local 321 Health Care Plan v. G & W Constr. Co., 783 F.3d 1045, 1057 (6th Cir. 2015) (declining to address a claim “[b]eeause it is not our function to craft an appellant’s arguments”); United States v. Hayter Oil Co., Inc. of Greeneville, 51 F.3d 1265, 1269 (6th Cir. 1995) (finding that defendants had waived their claims when they “d[id] nothing more than make the conclusory assertion that their rights ... were violated”); see Citizens Awareness Network, 59 F.3d at 293 (concluding that a party had waived claims in light of the “sparsity of its allegations and the complete lack of argument or factual support”); United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) (stating that a “skeletal ‘argument’ ” does not preserve a claim and explaining that “[j]udges are not like pigs, hunting for truffles buried in briefs”). And while it may be tempting to flesh out the parties’ arguments for them, it is improper for the courts to do so. See Lido-Chem, Inc. v. Stoller Enters., Inc., 500 Fed.Appx. 373, 388-89 (6th Cir. 2012) (Thapar, J., dissenting in part). Our system is an adversarial one, and it is up to the parties to spar with each other on each and every issue. Judges have no role in this fight other than to declare a winner. And if we begin to assist the parties in performing their function, it will quickly usurp ours. If appellate courts roll up their judicial sleeves, scour the record, and develop the relevant arguments and counterarguments, what is to prevent the parties from submitting a two-page brief stating their legal claims and leaving it to the court to do the rest? There must be a line, and fortunately that line has already been drawn. The Brenays fall on the wrong side of it: Their malicious-prosecution claim is forfeited. II. For the foregoing reasons, we affirm in part and reverse in part. The Brenays may proceed with their unlawful-entry claim against Officer Sierras on remand. But the district court’s judgment is affirmed in all other respects. . The Sixth Circuit often uses the concepts of forfeiture and waiver interchangeably in this context as the cases cited herein demonstrate. The Supreme Court has explained the technical distinction between the two: “Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.' " United States v. Olano, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). This is forfeiture.