NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0340n.06

Nos. 21-5642/5750

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| GARY D. GRANT, as Administrator of the Estate of Bradley Grant, | ) ) ) | **FILED**<br>Aug 18, 2022<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee/Cross-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| v. | ) ) ) |  |
| DREW WILSON and AARON FREDERICK, in their individual capacities as Kentucky State Troopers, | ) ) ) |  |
| Defendants-Appellants/Cross-Appellees. | ) ) ) ) | OPINION |

Before: ROGERS, KETHLEDGE, and MURPHY, Circuit Judges.

ROGERS, Circuit Judge. The defendant officers were attempting to locate a child sexual abuse suspect when they came across Brad Grant, a person unrelated to the investigation, at a property where the officers expected to find the suspect. The officers, Officers Wilson and Frederick, conducted a warrantless entry and search of the home, and the officers encountered Grant as he was experiencing a mental health crisis and threatening himself with a shotgun. Officer Frederick shot and killed Grant. Grant's estate sued under 42 U.S.C. § 1983, alleging Fourth Amendment violations from the unlawful entry of the home and the use of excessive force. As the district court concluded, the officers are not entitled to qualified immunity on the unlawful entry and search claim, but they are entitled to qualified immunity on the excessive force claim based on the lack of violation of clearly established law.

**I.**

Michael Wilson is a road trooper with the Kentucky State Police and is based in Harlan, Kentucky. On May 20, 2018, Wilson was on duty and went to the Harlan hospital to respond to a report of suspected sexual assault of a young child. Detective Aaron Frederick of the Kentucky State Police was also instructed to report to the hospital. The hospital staff told Wilson that the child was suffering from hand mark bruises, burns, and rectal bleeding, and the staff informed Wilson of their conclusion that the child had been sexually assaulted. Frederick said a doctor informed him that the child had suffered an anal tear.

The child's mother, Erica Letanosky, arrived at the hospital and began arguing with the child's grandmother. According to Wilson, he "dealt with Ms. Letanosky several times over [his] career," and "[s]he was extremely upset that her mother had brought her child to the hospital and got the state police involved without her involvement." Wilson had previously interacted with Letanosky when he was an officer with a local police force and had previously arrested Letanosky.

When Frederick arrived at the hospital and began questioning Letanosky, she told Frederick that she had suspected that her boyfriend, Devin Farley, was harming her child. The child's grandmother also indicated that Farley could be the abuser. Letanosky explained that she suspected Farley because her child had been upset around Farley recently, and Farley was the only unrelated person with whom Letanosky's child lived at home. Letanosky told Frederick that there could be warrants out for Farley, and Wilson and Frederick confirmed that Farley did in fact have active warrants out for his arrest. The warrants were for wanton endangerment in the first degree of a police officer, driving under the influence, driving with a suspended license, failure to produce an insurance card, tampering with physical evidence, and menacing.

2

Wilson and Frederick called Child Protective Services to stay at the hospital with the child while they went to look for Farley. Wilson said that Letanosky informed the officers that Farley would probably be at his mother's house. Similarly, Letanosky said she told the officers that the only place that Farley would be staying would be his mother's house. Farley's mother, however, later told the police that Farley did not regularly stay with her, and that it was uncommon for him to be at the house. The officers questioned Letanosky about Farley and what they might encounter at the mother's house. Letanosky told the officers that Farley did not have any guns. Letanosky added, however, that Farley would run from the officers and may try to fight them. Frederick asked Letanosky to go with the officers to bring them to the house where she said Farley would be located, because Frederick was not familiar with the area and Letanosky did not provide an exact address. Frederick stated that his intention in going to find Farley was to arrest him, based on both his outstanding arrest warrants and the fact that he was Frederick's primary suspect in the child abuse case.

Frederick rode in his unmarked car, while Wilson took Letanosky along with him in his marked police vehicle. Wilson did not ask dispatch for a physical description of Farley. When Wilson and Frederick pulled up to Farley's mother's house, they saw Grant pressure washing the house. Grant saw the cars approach, threw the pressure washer down, and ran around the house. Wilson asked Letanosky if the man was Farley, and according to Wilson, she responded "I don't know" several times. As Wilson exited his vehicle, Wilson said that Letanosky may have yelled a name at him, but Wilson did not hear what she said. Wilson interpreted Letanosky's responses as a reluctance to identify the man and thought Letanosky was giving Farley a chance to get away. According to Letanosky, however, she immediately recognized Grant and said "that's Brad, that's

3

not Devin" when Wilson pulled into the driveway. Letanosky knew that Grant was usually at Farley's mother's house every day doing odd jobs around the property.

Both officers exited their vehicles, and Wilson informed Frederick that Letanosky did not know who the man was. Frederick recalled that Wilson told him that Letanosky "said that might not be our guy, but it could be. I don't know who this is." But Wilson stated that at that point he believed the man was Farley, because it was Farley's mother's house and Letanosky had indicated that he would be there. Frederick also said that he was certain the man was Farley because, as he recalled years later, Letanosky allegedly told him that Farley would be the only person at the house and would run from the officers. Frederick and Wilson headed towards the house in pursuit of Grant. Letanosky heard the officers announce themselves as Kentucky State Police, and Letanosky said that Wilson and Frederick repeatedly banged on the door in an attempt to get Grant to come out. Frederick walked around the house until he reached a porch, and he heard a loud noise coming from inside. Wilson and Frederick approached the open back door and repeatedly announced that they were Kentucky State Police.

When Grant still did not present himself, Frederick and Wilson entered the house. They cleared the kitchen and living room with their weapons drawn, and then heard a noise down the hallway. Wilson stated that at this time, he continuously announced that he was Kentucky State Police. Wilson heard movement downstairs and informed Frederick. Frederick said that he also told Wilson that they needed to check downstairs. Frederick began moving down the stairs, but Wilson stopped him and went in front of Frederick because Wilson was wearing a vest and was in full uniform. As Wilson and Frederick proceeded down the stairs, they continuously stated that they were Kentucky State Police, "make yourself known," and "come out with your hands up."

4

After reaching the bottom of the stairs, the officers continued down a hallway to follow movement they heard behind a door. Wilson and Frederick approached the door and repeatedly announced themselves. Wilson heard Grant yelling from behind the door and could not understand what Grant was saying. Frederick tried to open the door while Wilson stood behind him and watched their surroundings, but the door was locked. Grant continued to yell at the officers, and Frederick yelled at Grant to come out. Frederick repeatedly kicked the door until it swung open. Frederick yelled "State police. Show me your hands." Frederick heard Grant say "okay," so Frederick waited a few seconds, but he still did not see any hands and did not know where Grant was located in the room. Frederick slowly moved into the doorframe. Wilson followed Frederick into the doorway and Frederick began slowly turning towards the right, where the voice was coming from.

When Frederick moved into the doorway, he saw Grant facing towards him and holding a shotgun pointed at Grant's own chin, with his finger on the trigger. Frederick had his gun drawn and, according to both Frederick and Wilson, Frederick immediately said "Kentucky State Police. Drop your gun." Wilson stated that Grant's voice got louder, but Wilson could not see Grant and did not know what he was saying. Frederick said Grant repeated "shoot me, shoot me." Frederick saw Grant rocking back and forth, and Frederick stated that Grant was slowly shuffling towards Frederick. Frederick and Wilson both said that Frederick repeated "drop the gun" twice more. Frederick heard Grant say "shoot me," at which point Frederick said Grant was four or five feet away from him. Frederick shot four times, and Grant stumbled backwards and fell in the back right corner of the room. Wilson claims that when Frederick fired the shots, Frederick had one leg in the hallway that led up to the door and the other leg on a step down that marked the entrance to the room, and Frederick was leaning around the door towards the right. Frederick told Wilson that

5

the victim was down, and the officers fully entered what Wilson described as an enclosed garage. Photos from the scene, as well as statements by Frederick and Wilson, indicate that the garage room was cluttered with items such as tools. During this entire sequence of events, Frederick and Wilson claim they believed the man with the gun was Farley.

Frederick stated that as Grant lay on the ground, he was still holding the gun up to his own chin. Wilson saw Grant lying on his back near the far-right wall and holding a single-shot shotgun in his left hand. According to Wilson, Grant was bleeding profusely, and his feet were pointing towards the door that the officers had entered through. Wilson stated that Grant was still conscious and twice said "thank you, boys, for doing what you do," and then asked the officers to tell his mother that he loved her. Frederick also said that Grant thanked the officers and asked them to tell his mother that he loved her. Wilson kept telling Grant to drop the gun so the officers could help him, but Grant did not comply, so the officers kept their guns drawn. Wilson asked Grant who he was and why he did this, and the man responded "I'm Brad." Wilson looked at Frederick and asked "who the hell is Brad," and then Wilson said to Grant "where is Devin? We're here for Devin." According to Frederick, Wilson said "You're not even the guy we're looking for." Grant began laughing and then lost consciousness. After Grant lost consciousness he dropped the gun, and then Wilson moved the gun away from Grant and attempted to call his post station. Frederick did not have a radio, so he instructed Wilson to call for EMS. Wilson, however, thought that his calls were not going through. Frederick instructed Wilson to cover Grant while Frederick got his first aid kit from the car.

Frederick left the house to get his first aid kit while Wilson stayed with Grant. Letanosky saw Frederick walk up to his car looking upset. When Frederick returned with the first aid kit, the officers began administering aid until EMS arrived. Wilson heard movement upstairs and went

6

up the stairs and announced himself as Kentucky State Police, and greeted the police officer and first responders who had arrived on the scene. Letanosky rode back to the police station with Wilson and Frederick. Wilson claims that Letanosky "told us that she knew the gun was in the house and didn't know that Brad was there, but knew he had the gun."

The man Frederick shot was Brad Grant, not Devin Farley. Farley's stepfather told the police that Grant had been staying at the house for a few days and doing some work on the property for Farley's mother and stepfather. According to the autopsy report and photographs, Grant had one gunshot entrance wound on the top of his right arm near his shoulder. He had another gunshot entrance wound on the left side of the front of his chest. A secondary wound on his arm indicated that one of his arms was raised when he was shot. Captain James Goble, who was a member of the Kentucky State Police's Critical Incident Response Team at the time of the shooting, estimated that Frederick was approximately eight to fifteen feet, or possibly a bit farther, from Grant when Frederick shot Grant. Based on the autopsy, Goble concluded that at the time Frederick fired, Grant was "angled in some fashion to Detective Frederick with his front still presenting to Detective Frederick but angled in some position."

Grant's counsel hired Knox & Associates, a forensic consulting group, to analyze the scene. Michael A. Knox, Ph.D., a board certified crime scene reconstructionist, concluded that "[t]he location of Frederick when he fired cannot be reasonably approximated apart from his testimony; however, there is a complete absence of muzzle effluent indicators that would place him within intermediate range of Grant when he fired, indicating that his muzzle-to-target distance was likely greater than three feet, though it could have been as high as 10 feet." Additionally, "[b]ased on the location of the dripped and projected bloodstains on the floor and objects, Grant was approximately ten feet from the doorway when he was shot." The report stated that "[t]here

7

were projected bloodstains on the objects between Frederick's location in the doorway and the location of Grant's final rest, indicating that Grant was positioned close to Frederick when Frederick fired." Knox found that some of the projected bloodstain patterns were "consistent with having originated from the gunshot wound to the right shoulder as Grant turned to his left as described by Frederick." Knox's report also noted that "[t]here was impact blood spatter on the shotgun." Knox concluded that "Grant was approximately ten feet away from Frederick when Frederick fired," and that "Grant was facing approximately diagonally toward the corner of the garage with his right side exposed to Frederick when Frederick fired."

The administrator of Grant's estate sued Frederick and Wilson in their individual capacities under 42 U.S.C. §1983. The administrator also asserted state law tort claims. The district court denied the officers' motion for summary judgment on the unlawful entry and search claim, but granted summary judgment on the excessive force and state law tort claims. On the unlawful entry and search claim, the court held that the officers violated the Fourth Amendment by entering and searching the home without a warrant. The court first rejected the officers' argument that the fact that there was an outstanding warrant out for *Grant's* arrest meant that Grant's "interest was not harmed" by the warrantless entry. The court concluded that because the officers did not know that information "at the time they entered the home," the officers "cannot rely" on Grant's warrant to justify the entry. The court then held that the arrest warrant for Farley did not justify entry and that the hot pursuit warrant exception did not apply. This was not a hot pursuit, the court reasoned, because "no one had yet made any attempt to arrest Mr. Grant" in a public place as required for the exception to apply. The court then held that the officers were not entitled to qualified immunity because they violated clearly established law. The court viewed the clearly established law as the fact that warrantless searches "are presumptively unreasonable," especially when the hot pursuit

8

exception does not apply "and evidence indicates that the Defendants knew or should have known that the man they were chasing was not the person they were after."

However, the court held that the officers were entitled to qualified immunity on the excessive force claim, and granted the officers' motion for summary judgment. According to the court, Frederick did not use excessive force when he shot Grant because Grant was actively wielding a gun with his finger on the trigger and was in relatively close proximity to Frederick in a confined space. The court also granted Frederick's motion for summary judgment on Grant's state law tort claims, concluding that Frederick was entitled to qualified immunity under Kentucky law. The court granted Grant's Rule 54(b) motion for the entry of final judgment on the excessive force claim. Wilson and Frederick appeal the district court's denial of qualified immunity on the unlawful entry and search claim, and the administrator of Grant's estate appeals the district court's grant of the officers' motion for summary judgment on the excessive force claim.

## II.

### A.    Warrantless Search and Entry

The district court properly denied qualified immunity with respect to the administrator's warrantless entry and search claim. The officers admit that there was no search warrant, but argue that Farley's arrest warrant, Grant's arrest warrant, or the hot pursuit exception justified the entry. These arguments fail for legal insufficiency or because the district court determined that there was a genuine issue of material fact with respect to the question of whether the defendants had a sufficient basis to believe that it was Farley that they saw.

*Outstanding arrest warrants*. First, Frederick and Wilson did not have authority to enter Farley's mother's home based on Farley's outstanding arrest warrants. "The Fourth Amendment provides that '[t]he right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures, shall not be violated.'" *Lange v. California*, 141 S. Ct. 2011, 2017 (2021). To comply with the Fourth Amendment, a law enforcement officer generally must obtain a search warrant in order to enter a home without consent. *Id*. However, "[t]he Supreme Court has held that 'an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'" *United States v. Baker*, 976 F.3d 636, 642 (6th Cir. 2020) (quoting *Payton v. New York*, 445 U.S. 573, 603 (1980)). The Court has, by contrast, held that officers violate a third party's Fourth Amendment rights if they look for an arrestee subject to an arrest warrant in the third party's home without obtaining a search warrant. *See Steagald v. United States*, 451 U.S. 204, 212-16 (1981). The police in this case were attempting to execute outstanding arrest warrants for Farley, which as a result would give the police permission to enter Farley's dwelling. *See Payton*, 445 U.S. at 603. There is no evidence, however, from which Frederick and Wilson could reasonably conclude that the address they were heading to was in fact Farley's residence. *Cf. El Bey v. Roop*, 530 F.3d 407, 415 (6th Cir. 2008). Letanosky told the officers that Farley had been living with her up until the previous day and suggested his mother's home as a place where he could be temporarily present. Consequently, Farley's arrest warrant did not give the officers direct authority to enter Farley's mother's home. *See Steagald*, 451 U.S. at 212-16.

Admittedly, our court has since read *Payton* and *Steagald* together to hold that an *arrestee* subject to an arrest warrant cannot raise a Fourth Amendment challenge even when officers enter a *third party's* home to make the arrest without a search warrant and discover further evidence of the arrestee's crimes. *See United States v. Cammon*, 849 F. App'x 541, 544 (6th Cir. 2021); *United States v. Pruitt*, 458 F.3d 477, 481-82 (6th Cir. 2006). But here, the administrator of Grant's

10

estate—rather than Farley, the person subject to the arrest warrant—raises the Fourth Amendment challenge to the officers' entry.

Second, even if officers could sometimes enter a third party's home based on a reasonable belief that the arrestee was in the home, that rule would not help the officers in this case. The district court concluded there was a genuine issue of fact as to whether the officers could reasonably conclude that Farley was present. Officers can make the determination about whether an arrestee is in a home "based on common sense factors and the totality of the circumstances." *Pruitt*, 458 F.3d at 485. We recently noted that "we have at times vacillated between a 'probable cause' and a lesser 'reasonable belief' standard to define whether an officer fairly had 'reason to believe the suspect is within [a dwelling].'" *Cammon*, 849 F. App'x at 544 (quoting *Baker*, 976 F.3d at 642). That distinction is not important here, however, because under the facts as we must accept them the officers cannot meet even the lower reasonable belief standard.

Evidence conflicted as to whether the officers reasonably believed that Farley was in the house. The district court accepted that "Ms. Letanosky state[d] that she told Trooper Wilson upon pulling into the driveway that the person who was pressure washing beside the house was not Mr. Farley," and that "Trooper Wilson told Detective Frederick that he was not sure whether the person they were pursuing was '[their] guy' but pursued him into the house anyway." Besides Letanosky's previous statement that Farley would be located at that address, the officers had no other evidence connecting Farley to this address. The officers had not even asked for a photo or a description of Farley, because they planned on relying on Letanosky's identification. Given the officers' complete reliance on Letanosky to connect Farley to the address, once Letanosky informed the officers that the man on the property was not Farley, the district court concluded that

11

there was a genuine issue of material fact regarding whether it was unreasonable for the officers to continue to believe that the man was Farley.

Both officers later testified that even at that point, they were still convinced the man was Farley based on Letanosky's previous statements, the fact that the address was his mother's house, and Letanosky's statement that Farley would run from the officers. But that alleged certainty is contradicted by the officers' own testimony about Wilson's statement to Frederick after both officers exited their vehicles. According to both Wilson and Frederick, Wilson told Frederick that he was unsure who the man was. In any event, reasonableness under the Fourth Amendment "is predominantly an objective inquiry." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (quotation omitted). The Supreme Court emphasized that "[t]his approach recognizes that the Fourth Amendment regulates conduct rather than thoughts . . . and it promotes evenhanded, uniform enforcement of the law." *Id*. (citations omitted). In this case, the district court concluded that "viewing the facts in the light most favorable to the nonmoving party, Defendants arguably lacked a good reason to believe the person they were pursuing in the house was Mr. Farley." Indeed, at oral argument, counsel for Trooper Wilson and Detective Frederick conceded that construing the facts in the light most favorable to the non-moving party, we must accept that Letanosky told Wilson that the man was not Farley.

Because this is an interlocutory appeal, the officers cannot challenge the district court's characterization of the facts, including "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). Similarly, "a defendant may not challenge the inferences the district court draws from those facts, as that too is a prohibited fact-based appeal." *DiLuzio v. Vill. Of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (citing *Romo v. Largen*, 723 F.3d 670, 673-74 (6th Cir. 2013)). These factual disputes ultimately prevent the

officers from being entitled to qualified immunity at this stage on the basis of their assertedly reasonable belief that Farley was in the house.

Third, and finally, the fact that Grant also had a warrant out for his arrest also did not give the officers the authority to conduct a warrantless search. Fourth Amendment claims are analyzed based on what the officers knew at the time they made the relevant decisions. When applying the Fourth Amendment's objective reasonableness test, therefore, we "must consider only the facts the officers knew at the time of the alleged Fourth Amendment violation." *Lewis v. Charter Twp. of Flint*, 660 F. App'x 339, 343 (6th Cir. 2016) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1155 n.3 (6th Cir. 1996)). It is undisputed that at the time the officers entered the home, they did not know that the man was Grant, and certainly did not know that Grant had a warrant out for his arrest. Consequently, the fact that the officers later learned that there was a warrant out for Grant's arrest is irrelevant for Fourth Amendment purposes.

*Hot pursuit exception.* Moreover, the lack of a pursuit or an emergency situation defeats the officers' alternative argument the hot pursuit exception to the warrant requirement applies. The hot pursuit exception permits officers to enter a home to apprehend a felony suspect who flees from an attempted arrest in a public place. *United States v. Santana*, 427 U.S. 38, 43 (1976); *Coffey v. Carroll*, 933 F.3d 577, 586 (6th Cir. 2019).

The officers here cannot show that one of the basic requirements of a hot pursuit was met: the initiation of pursuit of the suspect. The officers here did not witness a crime, attempt to arrest the suspect, and then watch the suspect flee. Instead, Wilson and Frederick knew of an alleged crime that had been committed at some earlier time, and Grant ran into the home before he interacted with the police in any capacity. We have emphasized that "[t]he 'pursuit' begins when police start to arrest a suspect in a public place." *Smith v. Stoneburner*, 716 F.3d 926, 931 (6th

13

Cir. 2013). That threshold requirement never occurred in this case. Grant fled when he saw a police car down the driveway, before the officers had even gotten out of their vehicles. In *Smith v. Stoneburner*, we held that the hot pursuit exception did not apply when the plaintiff tried to end a conversation with the police by walking inside his house and attempting to close the door. *Id*. We concluded that "[t]o call that choice 'flight' would make a fugitive out of any citizen who exercises his right to end a voluntary conversation with a police officer. In consensual encounters, we think of individuals as 'free to leave,' not 'free to flee.'" *Id*. We added that the officer had never told the plaintiff that he was under arrest, and "short of that, or something similar, [the plaintiff] had the right to 'decline to listen to the questions . . . and . . . go on his way.'" *Id*. (quoting *Florida v. Royer*, 460 U.S. 491, 498 (1983)); *see also Brenay v. Schartow*, 709 F. App'x 331, 335 (6th Cir. 2017). Given that we have declined to apply the hot pursuit exception even when plaintiffs had face-to-face encounters with the police and retreated into their homes, it does not apply here when Grant had no interaction with the police at all when he ran inside the house.

Furthermore, this situation lacks the type of emergency that is required for the hot pursuit exception to apply. A hot pursuit occurs when "the emergency nature of the situation necessitates immediate police action to apprehend the suspect," *Cummings v. City of Akron*, 418 F.3d 676, 686 (6th Cir. 2005), and we have declined to apply the exception when "the sequence of events lacked an emergency," *Coffey*, 933 F.3d at 586. We later explained that "*Coffey* stands for the reality that the pursuit must actually be hot, rather than 'lukewarm at best.'" *Allen v. City of Ecorse*, No. 21-1268, 2021 WL 5320446, at *2 (6th Cir. Nov. 16, 2021) (quoting *Coffey*, 933 F.3d at 586). The pursuit here falls into the "lukewarm" category. From the information known to Frederick and Wilson at the time they followed Grant into the house, the suspect on the property was not armed, the victim of the alleged crime was safely under the watch of Child Protective Services at the

14

hospital, and there were no other potential victims on the premises. Frederick and Wilson took the time to conduct interviews at the hospital before departing to look for the suspect. That is not the type of emergency situation in which the hot pursuit exception is applied. We have held that the hot pursuit exception did not apply in more extreme situations, such as when the police conducted a warrantless entry to apprehend a known gunman who barricaded himself inside his home. *See O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997 (6th Cir. 1994).

The Supreme Court recently emphasized that "the contours of [a] . . . warrant exception permitting home entry are 'jealously and carefully drawn,' in keeping with the 'centuries-old principle' that the 'home is entitled to special protection.'" *Lange*, 141 S. Ct. at 2018 (quoting *Georgia v. Randolph*, 547 U.S. 103, 109 (2006)). We have repeatedly held that a hot pursuit must involve an emergency situation and an imminent pursuit. In *Coffey v. Carroll*, we defined hot pursuit "as an effort to catch and detain an individual following an attempted arrest and subsequent escape" when in an "emergency" situation. 933 F.3d at 586. Similarly, we have held that "because there was no immediate or continuous pursuit of the Defendant from the scene of a crime, the officers were not in hot pursuit of a fleeing felon." *United States v. Saari*, 272 F.3d 804, 812 (6th Cir. 2001); *see also Cummings*, 418 F.3d at 686. Most recently, in *Allen v. City of Ecorse*, we explained why a previous panel declined to apply the hot pursuit exception: "Notably, the officers did not witness that crime. And their pursuit was not immediate but occurred 'sometime later.'" 2021 WL 5320446, at *2. The same is true here. Wilson and Frederick did not witness the crime, which allegedly occurred at an unspecified earlier date. The officers did not even immediately pursue the suspect once they learned of the crime at the hospital—instead, they took the time to interview relevant individuals and ensure that the victim was safe before leaving to look for the suspect. Our precedents make clear that such a situation is not a hot pursuit.

15

## B.    Excessive Force[1]

The officers are entitled to qualified immunity on the excessive force claim because the administrator of Grant's estate cannot establish a clearly established violation of a constitutional right.  Courts may consider the qualified immunity analysis in either order, so this analysis will proceed to the clearly established prong.  *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam).  "A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  *Kisela*, 138 S. Ct. at 1152 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).

The administrator argues that it is clearly established that officers cannot use deadly force when a suspect does not pose an imminent threat.  *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985). While true, that proposition is at too high a level of generality and thus is inapplicable here.  For example, the Supreme Court has described the level of specificity required in one situation as "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight."  *Mullenix*, 577 U.S. at 13 (quoting *Brosseau v.*

---

[1] A plaintiff may appeal a grant of qualified immunity on a claim that is not final by virtue of the denial of qualified immunity on a different claim, but only if the district court certified the otherwise not final claim as a final judgment under Rule 54(b).  Grant moved for the entry of final judgment on the excessive force claim, which the defendants did not object to.  The district court granted the motion and entered final judgment, permitting Grant to pursue an appeal on this claim.  Although neither party contests our jurisdiction over this claim, we must consider sua sponte whether the Rule 54(b) certification was proper, because jurisdiction is dependent on proper certification.  *See Lowery v. Fed. Express Corp.*, 426 F.3d 817, 820 (6th Cir. 2005).  Rule 54(b) provides that a district court may "direct entry of a final judgment as to one or more . . . claims only if the court expressly determines that there is no just reason for delay." We apply the *Corrosioneering* factors to evaluate Rule 54(b) motions, *Corrosioneering, Inc. v. Thyssen Environmental Systems, Inc.*, 807 F.2d 1279, 1283 (6th Cir. 1986), and the district court considered each factor here.

*Haugen*, 543 U.S. 194, 200 (2004)). The question here by analogy would be whether it is clearly established that an officer cannot use deadly force when a person is undisputedly wielding a firearm in close proximity to the officers, but is not aiming the firearm at the officers, and the person does not respond to commands to drop the weapon.

The administrator does not point to any cases in which we have held that an officer used excessive force under analogous circumstances. At oral argument, counsel for the administrator cited *Scozzari v. Miedzianowski*, 454 F. App'x 455 (6th Cir. 2012), as the plaintiff's strongest case, but that case is distinguishable on its facts. In *Scozzari*, the officers shot and killed a potentially mentally ill person who allegedly approached the officers with two knives after being tased and repeatedly told to drop the weapons. *See id.* at 458. We held that the officers were not entitled to qualified immunity on an excessive force claim. In that case, however, multiple eyewitnesses "sharply contradict[ed]" the officers' account, including whether the victim was even holding a knife. *Id.* at 458-59. We thus concluded that "in the light most favorable to Plaintiff, the evidence indicates that the Officers were standing 15 to 20 feet from [the victim] when they shot him. Further, Scozzari was 51 years old, 5'3' and 133 pounds, blind in one eye and hardly physically intimidating. Additionally, there are genuine issues of material fact whether Scozzari was wielding a knife and hatchet over his head." *Id.* at 463. The facts are quite different here. It is undisputed that Grant was holding a shotgun pointed at his own chin, making the situation fundamentally different from a case in which it was disputed whether the victim was even holding a knife or other weapon.

Recent Supreme Court precedent cuts against the administrator's argument that it is clearly established that officers cannot use lethal force when confronted with a person wielding a firearm. In recent cases, the Court held that officers were entitled to qualified immunity when facing

17

potential threats from weapons that are less lethal than a firearm. In *City & County of San Francisco v. Sheehan*, 575 U.S. 600 (2015), the Supreme Court held that the officers' use of force did not violate clearly established law when they fired multiple rounds at a victim experiencing a mental health crisis. *See id*. at 612-13. The officers, who knew that the victim was having a mental health crisis, opened the victim's door once and the victim threatened the officers with a knife and said she would kill them, so the officers retreated. *See id*. at 604. The officers, with weapons drawn, attempted to open the door again and one officer used pepper spray on the victim. *See id.* at 605. The victim continued to wield the knife and was moving towards the officers when they shot her. *See id*. at 605-06. The Court held that the use of force was reasonable because an officer "tried to subdue [the victim] with pepper spray, but [the victim] kept coming at the officers until she was only a few feet from a cornered [officer]." *Id*. at 612-13 (quotation omitted). In another case, the Supreme Court held that the officers "plainly did not violate any clearly established law" when they fired at a man who ignored commands to drop a hammer and then held the hammer as if he was going to throw it at the officers. *See City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam).

In another recent case, we held that the officers' use of force was reasonable when the officers fired at a man who was holding a firearm pointing up, even though it was undisputed that the man did not at any point aim the firearm at the officers. *See Thornton v. City of Columbus*, 727 F. App'x 829, 838 (6th Cir. 2018). The officers responded to a report of a man threatening people with a firearm and claimed that upon entering a house to investigate, a man entered the room "holding the shotgun chest high, angled across his body," and the man "was holding the gun as though he could lower it toward them and fire at any moment." *Id*. at 831. The officers fired after the man, who was "less than fifteen away from the [o]fficers when he entered the living

room," ignored commands to drop the weapon and "continued to walk towards the [o]fficers." *Id*.

The plaintiff "dispute[d] this version of the events" and claimed that he did not see the officers,

did not hear their commands, and was not facing the officers. *See id*. at 831, 837. Despite those

factual disputes, we held that the use of lethal force was justified and concluded that whether the

man "actually heard the commands [to drop the weapon] has no bearing on this court's analysis."

*Id*. at 837. We reasoned that:

> And though Thornton never pointed the shotgun at the Officers before they fired
> their weapons, the undisputed manner in which Thornton was holding the weapon
> combined with the short distance between himself and the Officers further leads
> this court to conclude that any reasonable police officer would believe that
> Thornton posed a serious physical threat that required a use of deadly force.
> Additionally, because the deadly threat posed by Thornton could have easily and
> quickly transformed into deadly action in a split-second, any reasonable police
> officer in the Officer's position would know that a decision to use deadly force
> would need to be rendered quickly.

*Id*. at 837. We further rejected the argument that the officers acted too quickly in using deadly

force:

> The Officers also did not have to wait for Thornton to raise his weapon before
> employing deadly force. *See Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001)
> ("[A]n officer does not have to wait until a gun is pointed at the officer before the
> officer is entitled to take action."). Relatedly, this court has recently rejected a
> "categorical rule that force can only be reasonable if a suspect raises his gun."
> *Thomas*, 854 F.3d at 366. Accordingly, for the aforementioned reasons, the Officers
> did not violate Thornton's constitutional rights by utilizing force on him on April
> 21, 2013.

*Id*. at 838. The *Thornton* decision contains several factual similarities to the instant case, most

notably that it was undisputed that the victim never aimed his firearm at the officers and it was

unclear whether the victim was moving towards the officers when he was shot. While there were

other factors at play in *Thornton*, such as the fact that the police had responded to a report of a

man threatening other people with a gun, *see id*. at 837, the reasoning regarding the use of force

when the gun was not aimed at the officers is similar enough to the facts of this case to prevent the

19

administrator of Grant's estate from successfully arguing that it was clearly established that such conduct was prohibited.

## III.

For the foregoing reasons, we affirm the judgment of the district court.